UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR.,<br><br>Plaintiff,<br><br>v.<br><br>JOSH TEWALT, Director, Idaho Department of Correction; TIMOTHY RICHARDSON, Warden, Idaho Maximum Security Institution; and Unknown Employees, Agents or Contractors of the Idaho Department of Correction,<br><br>Defendants. | Case No. 1:21-cv-00267-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Before the Court is Defendants' Superseding Motion to Dismiss Amended Complaint [DKT 23] (Dkt. 70). For the reasons explained below, the Court will grant the Motion and dismiss this case.

## BACKGROUND

**1.     This Lawsuit**

Plaintiff Gerald Ross Pizzuto, Jr. is a death-row inmate in the custody of the Idaho Department of Correction (IDOC) and housed at the Idaho Maximum Security Institution (IMSI). A professing Christian, Pizzuto wishes to have his spiritual advisor in the execution chamber during his execution. *Am. Comp.* ¶¶ 37

& 43, Dkt. 23. Pizzuto also wants his spiritual advisor to say an audible prayer and maintain physical contact with him during the execution. *Id.* ¶ 45. Pizzuto believes that his spiritual advisor's presence, touch, and prayer will provide him with "spiritual fortitude and well-being" in his final moments. *Id.* ¶ 43.

In April of 2021, Pizzuto submitted a formal request for these accommodations. *Young Decl.*, Exs. 1–3, Dkt. 26-3. The IMSI Warden promptly denied his request, *Answer* ¶ 42, Dkt. 16, citing IDOC Standard Operating Procedure 135.02.01.001 ("SOP 135"), *Young Decl.*, Ex. 1 & 3, Dkt. 26-3. That protocol identifies the five categories of individuals who are permitted in the execution chamber during an execution. *See* SOP 135, Dkt. 61-2. Spiritual advisors are not on the list.

When his request was denied, Pizzuto filed this lawsuit against Josh Tewalt, Director of the IDOC, and Tyrell Davis, then-Warden of the IMSI.[1] *Compl.*, Dkt. 1; *Am. Compl.*, Dkt. 23. Pizzuto claims that excluding his spiritual advisor from the execution chamber would violate his rights under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, Idaho's Free Exercise of Religion Protected Act (FERPA), Idaho Code § 73-402, and, pursuant to 42 U.S.C. § 1983, the Free Exercise Clause of the First

---

[1] Timothy Richardson is now the Warden of the IMISI and a defendant in this case.

MEMORANDUM DECISION AND ORDER - 2

Amendment to the United States Constitution. By way of remedy, Pizzuto seeks a declaratory judgment invalidating the defendants' exclusionary policy, and an injunction requiring the defendants to revise their execution protocols so as to "allow the presence of Mr. Pizzuto's spiritual advisor in the execution chamber during the execution, allow the spiritual advisor to share an audible prayer with Mr. Pizzuto before the execution commences, and allow the spiritual advisor to physically contact Mr. Pizzuto during his execution until he passes[.]" *Am. Compl.* ¶ 118(a)–(d), Dkt. 23.

**2.      Defendants Approve Pizzuto's Religious Accommodations**

In March of 2022, the United States Supreme Court issued a decision in the case of *Ramirez v. Collier*, 595 U.S. 411 (2022). The Court held that Texas' categorical ban on audible prayer and pastoral touch by spiritual advisors during executions violated the Religious Land Use and Institutionalized Persons Act (RLUIPA). *Id.* at 430, 433. Although Texas had a compelling interest in preventing disruptions and preserving solemnity and decorum in the execution chamber, the Court concluded that there are less restrictive means of achieving those ends. *Id.* For example, Texas could "allow touch on a part of the body away from IV lines," "require that the pastor undergo training," or "limit[] the volume of any prayer" to avoid disruption. *Id.* at 430, 432.

MEMORANDUM DECISION AND ORDER - 3

Shortly after the Supreme Court decided *Ramirez*, the parties in this case "reached an agreement regarding . . . the presence of Mr. Pizzuto's spiritual advisor, pastoral touching, audible prayer and use of certain religious objects during Mr. Pizzuto's execution." Dkt. 48 at 2. Namely, "in light of the Supreme Court's opinion in *Ramirez*," Defendant Tewalt reversed course and "approved Mr. Pizzuto's religious requests." *Tewalt Decl.* ¶¶ 1–14, Dkt. 56-1. Thus, under the parties' agreement, Pizzuto's spiritual advisor will be allowed to be present in the execution chamber, to say an audible prayer, and to maintain physical contact with Pizzuto during the execution.[2]

### 3.   Defendants' Motion to Dismiss

The parties agree that the substantive dispute in this case has now been resolved. *Pl.'s Suppl. Br.* at 2, Dkt. 50; *Def.'s Suppl. Br.* at 2–3, Dkt. 51. The remaining question, then, is what is left of this litigation.

According to the defendants, this case must now be dismissed as moot because Pizzuto "has received the substantive relief he seeks." *Def.'s Memo. in Supp.* at 8, Dkt. 70-1. Pizzuto disagrees. Despite Defendant Tewalt's promise to provide him with religious accommodations, Pizzuto argues that this case will not

---

[2] Pursuant to the parties' agreement, Pizzuto will also be permitted to wear a scapular during the execution, and his spiritual advisor will be allowed to possess and retain a rosary. *Tewalt Decl.* ¶ 10, Dkt. 56-1.

be fully resolved until the defendants have modified their written execution protocols to reflect the principles set forth in *Ramirez*.

## LEGAL STANDARDS

Under Rule 12(b)(1), a lawsuit must be dismissed when a court lacks subject matter jurisdiction over the action. FED. R. CIV. P. 12(b)(1).[3] "The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). Accordingly, "an actual controversy must be extant at all stages of review, not merely at the time the [amended] complaint is filed." *Id.* "[I]f a plaintiff's stake in a lawsuit falls away, so too does [the court's] subject-matter jurisdiction." *Shemwell v. City of McKinney, Texas*, 63 F.4th 480, 483 (5th Cir. 2023); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 170 (2000) ("Courts have no license to retain jurisdiction over cases in which one or both of the parties plainly lacks a continuing interest[.]"); *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1087 (9th Cir. 2011) ("[I]f events subsequent to the filing of the case resolve

---

[3] Where, as here, a defendant raises a factual challenge to jurisdiction, the court "may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary[.]" *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023); *see also Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022).

the parties' dispute, we must dismiss the case as moot . . . because [we] do not have the constitutional authority to decide moot cases.") (cleaned up).

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up). But "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Id.* (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* Rather, a party who asserts mootness after voluntarily ceasing the challenged conduct "has the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Fikre v. Federal Bureau of Investigation*, 904 F.3d 1033, 1037 (9th Cir. 2018) (cleaned up). This principle is known as the "voluntary cessation doctrine."[4]

---

[4] Courts often refer to the voluntary cessation doctrine as an "exception" to mootness. *See, e.g.*, *Fikre*, 904 F.3d at 1039. But that characterization is somewhat confusing, because the presence of voluntary cessation merely heightens the burden on the defendant rather than precluding a finding of mootness altogether. This Court prefers thinking of the voluntary cessation doctrine as the Third Circuit described it in *Hartnett v. Pennsylvania State Education Association*:

Government officials are presumed to be acting in good faith when they assert mootness through voluntary cessation. *Id.*; *Brach v. Newsom*, 38 F.4th 6, 12 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 854 (2023) ("Although we hold the government to the same burden as private litigants in making this determination, we nonetheless treat the voluntary cessation of challenged conduct by government officials with more solicitude."). In other words, a court should not impute improper motives to a government official who ceases the challenged conduct while litigation is pending. Nevertheless, to establish mootness, "the government must still demonstrate that the change in its behavior is 'entrenched' or 'permanent.'" *Fikre*, 904 F.3d at 1037 (quoting *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015)). Especially when the change is not codified in a statute, but merely a change of policy, stance, or behavior. Such a change "moots an action only when it is absolutely clear to the court, considering the procedural safeguards insulating the new state of affairs from arbitrary reversal and the government's rationale for its changed practice(s), that the activity complained of will not reoccur." *Id.* at 1039 (cleaned up).

---

> Though voluntary or volitional cessation is often described as an exception to mootness, that is not quite right. The burden always lies on the party claiming mootness, whether the case involves voluntary cessation or not. Voluntary cessation is just a recurring situation in which courts are particularly skeptical of mootness arguments. That is why, in voluntary-cessation cases, defendants' burden of showing mootness is heavy.

963 F.3d 301, 307 (cleaned up).

**MEMORANDUM DECISION AND ORDER - 7**

The Ninth Circuit has identified several factors to consider when a government actor asserts mootness through voluntary cessation. *Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014). These include: whether (1) the change is evidenced by language that is "broad in scope and unequivocal in tone;" (2) the change fully addresses the "objectionable measures" previously taken against the plaintiff; (3) the case in question was the catalyst for the government's change of stance or behavior; (4) the new policy has been in place for a long time; and (5) officials have engaged in conduct similar to that challenged by the plaintiff since the policy change's implementation. *Id.* This is not an "exhaustive or definite list" of elements that the government must satisfy. *Id.* at 972 n.10. These are, instead, helpful factors that courts may consider. *See Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1153 (9th Cir. 2019) (describing *Rosebrock* factors as a "loose framework").

## ANALYSIS

The key question is whether this case is moot now that the defendants have approved Pizzuto's requested religious accommodations.[5] The answer turns on whether it is absolutely clear that the defendants will follow through on their

---

[5] The defendants offer additional grounds for dismissal under Federal Rules of Civil Procedure 12(b)(6) and 56. *See Memo. in Supp.* at 14–20, Dkt. 70-1. However, because the Court dismisses this case as moot, it need not address those alternative grounds for dismissal.

promise. *See Fikre*, 904 F.3d at 1037. Based on the presumption of good faith for government officials and the *Rosebrock* factors, the Court concludes that the defendants have satisfied their "heavy burden" of showing that Pizzuto will receive his religious accommodations. Accordingly, there is no longer any case or controversy and this action must be dismissed.

1. **This case is moot.**

Pizzuto no longer has a personal stake in the outcome of this litigation. He brought this lawsuit to obtain religious accommodations during his execution. This is not a class action lawsuit, nor is Pizzuto seeking to vindicate the rights of third parties. *Pl.'s Resp.* at 4, Dkt. 73. He "is concerned here with protecting his own rights at his own execution," *id.*, and he alleges only that "Executing *Mr. Pizzuto* Without His Spiritual Advisor in the Execution Chamber" would violate his rights, *Am. Compl.* at 9, 11 & 13, Dkt. 23 (emphasis added).

Initially, the defendants denied Pizzuto's requests. But soon after the United States Supreme Court issued its decision in *Ramirez*, Defendant Tewalt reversed course and approved each of Pizzuto's accommodations. *Tewalt Decl.* ¶ 4, Dkt. 56-1 ("[I]n light of the Supreme Court's opinion in *Ramirez v. Collier*, I have approved Mr. Pizzuto's religious requests and revised SOP 135 as set forth herein."). While the parties still disagree on whether the defendants' written policies should be revised in light of *Ramirez*, that debate is separate and apart

from the underlying controversy surrounding the spiritual advisor's involvement in Pizzuto's execution. In other words, although Pizzuto believes that the defendants *should* enshrine the principles of *Ramirez* in the State's written execution protocols, he no longer has a personal stake in that facet of this case because his accommodation requests have been approved. For that simple reason, this case is moot.

2. **The voluntary cessation doctrine does not preclude a finding of mootness.**

But the inquiry does not end there. When a defendant's voluntary conduct appears to moot a case, the Court must go further and determine whether the defendant has carried its "heavy burden" under the voluntary cessation doctrine. *Friends of the Earth*, 528 U.S. at 189. That is, the Court must decide whether it is "absolutely clear" that the defendant will not resume the challenged conduct after the case is dismissed. *Id.*

Defendants have made that showing. After applying the *Rosebrock* factors, the Court is confident that Pizzuto will not be denied his religious accommodations. First, in two sworn affidavits filed with this Court, Defendant Tewalt has guaranteed and carefully described the promised religious accommodations in broad and unequivocal terms. Dkts. 56-1 & 63-1. In doing so, he has detailed precisely what will be allowed and what will be expected of the

spiritual advisor. *Tewalt Decl.* ¶¶ 5–12, Dkt. 56-1; *Tewalt Decl.* ¶¶ 6–13, Dkt. 63-1. Pizzuto notes that "much can change" before his execution; for example, "it is possible that Director Tewalt will no longer be with IDOC." *Pl.'s Resp.* at 3, Dkt. 73. That is a valid point that might be a salient if there was any indication that Defendant Tewalt will be leaving the IDOC in the near future, or if he had reversed course in an unexplained exercise of discretion. But, as explained below, that is not the case. Rather, to the extent that the possibility of Defendant Tewalt leaving the IDOC diminishes the value of his promise to Pizzuto, the Court finds that the other *Rosebrock* factors provide adequate assurances that Pizzuto will receive his religious accommodations.[6] *See Brach*, 38 F.4th at 14 (rejecting possibility of reversal in public health situation as a "speculative contingency" insufficient to "skirt mootness").

    Second, the defendants addressed all of the allegedly "objectionable measures" previously taken against Pizzuto by granting all three of Pizzuto's original requests: pastoral presence, prayer, and touch. Indeed, Defendant Tewalt has gone even further than that, approving two additional accommodation requests

---

[6] Of course, Pizzuto could regain standing and revive this claim in the future if a new IDOC director is appointed and retracts Defendant Tewalt's approval of Pizzuto's religious accommodations.

**MEMORANDUM DECISION AND ORDER - 11**

that Pizzuto raised while this case was pending. *Tewalt Decl.* ¶ 10, Dkt. 56-1 (approving the use of a scapular and rosary).

Next, Defendant Tewalt has clearly identified the Supreme Court's opinion in *Ramirez* as the catalyst for his decision to reverse course and approve Pizzuto's requests. *Id.* ¶ 4 *("[I]n light of the Supreme Court's opinion in* Ramirez v. Collier, I have approved Mr. Pizzuto's religious requests and revised SOP 135 as set forth herein.")* (emphasis added). That independent basis for the defendants' change in stance lends credence to their assurance that Pizzuto will receive the accommodations. *See Public Utilities Comm'n of State of Cal. V. F.E.R.C.*, 100 F.3d 1451, 1460 (9th Cir. 1996) (finding case moot where external factors motivated the government's policy change); *see also id.* ("[I]n order for [the voluntary cessation] to apply, the defendant's voluntary cessation must have arisen because of the litigation.").

Third, Defendant Tewalt's commitment to provide Pizzuto's requested accommodations has remained in place and undisturbed for over a year and a half. *See American Diabetes Ass'n*, 938 F.3d at 1153 (noting that a new policy instituted two years prior had been in place for "a relatively long time"). During that time, the issuance of death warrants for Pizzuto has triggered execution preparations on two separate occasions, yet the defendants have apparently remained committed to

MEMORANDUM DECISION AND ORDER - 12

providing Pizzuto's religious accommodations. *See Pizzuto v. Tewalt*, Case No. 1:23-cv-00081-BLW, 2023 WL 4901992, at *1–2 (D. Idaho Aug. 1, 2024).

Finally, the defendants' conduct since approving Pizzuto's requests lends further credence to their guarantee of accommodation. In February of 2024, the IDOC attempted to execute another death-row inmate, Thomas Creech. At Creech's request, the defendants approved and provided religious accommodations nearly identical to the ones Pizzuto seeks. *Def.'s Reply* at 2–3, Dkt. 74 (citing Case No. 1:20-cv-00114-AKB, Dkt. 145). That recent course of conduct demonstrates the defendants' capability and willingness to accommodate pastoral presence, prayer, and touch in the execution chamber. It also credits Defendant Tewalt's explanation that his decision to reconsider and approve Pizzuto's requests was based on the Supreme Court's March 2022 decision in *Ramirez*, and was not merely a calculated attempt to duck this litigation.

The Ninth Circuit has found cases to be moot under similar circumstances. In *Picrin-Peron v. Rison*, for example, the Immigration and Naturalization Service (INS) released a prisoner to parole while the prisoner had a habeas corpus appeal pending. 930 F.2d 773, 774 (9th Cir. 1991). According to the government, the prisoner's release on parole mooted the habeas appeal, through which the prisoner was seeking release from confinement. The prisoner disagreed, invoking the voluntary cessation doctrine and arguing that the government might simply revoke

his parole and reincarcerate him once the habeas case was dismissed. In response, the government stated that, absent further criminal conduct, the prisoner's parole would not be revoked. *Id.* at 776. When the Ninth Circuit asked the government to provide "authority for its promise," the government filed an affidavit from the INS Director "who reiterated under oath" that the prisoner's parole would not be revoked. *Id.* "Based on that declaration," the Ninth Circuit was "satisfied that the alleged wrong [i.e. imprisonment] would not recur," and the court therefore dismissed the habeas appeal as moot. *Id.*

Here, as in *Picrin-Peron*, the defendants have done more than make bare assertions of mootness. In both cases, the government-defendants offered sworn, unequivocal assurances that the challenged conduct would not occur in the future. And here, as in *Picrin-Peron*, although the defendants have not codified their new stance in a statute or regulation, the Court is satisfied based on their sworn assurances and the other *Rosebrock* factors that Pizzuto will be provided his religious accommodations. *See Rosebrock*, 745 F.3d at 974 (finding mootness despite the lack of any "procedural safeguards in place preventing [the government-defendants] from changing course"); *see also Lee v. Biloxi School Dist.*, 963 F.2d 837 (5th Cir. 1992) (finding mootness based on the government-defendant's "express commitment" to provide plaintiff's child with the requested educational accommodations).


Conversely, this case differs from those in which courts have rejected assertions of mootness under the voluntary cessation doctrine. *See, e.g.*, *Planned Parenthood Greater Northwest v. Labrador*, 684 F.Supp.3d 1062, 1092 (D. Idaho 2023) (rejecting mootness under voluntary cessation doctrine where government's purported letter of cessation "[did] not indicate that [the government official had] changed his position"). In *Fikre v. Federal Bureau of Investigation*, for example, a plaintiff challenged the FBI's decision to place him on the No Fly List. 904 F.3d at 1039–40. Shortly after Fikre filed his lawsuit, the FBI removed him from the No Fly List, and the government moved to dismiss the case as moot. On appeal, the Ninth Circuit considered the voluntary cessation doctrine and rejected the government's assertion of mootness for three reasons. *Id.* at 1039. First, the FBI's decision to remove Fikre from the No Fly List was not "[]tethered to any explanation or change in policy, much less an abiding change in policy." *Id.* at 1040. The timing and lack of any external catalyst for the change made the removal seem "more like[] an exercise of discretion than a decision arising from a broad change in agency policy or procedure." *Id.* Second, the Ninth Circuit emphasized that the FBI "ha[d] not assured Fikre that he [would] not be banned from flying for the same reasons that prompted the government to add him to the list in the first place[.]" *Id.* at 1040. And finally, since the government had not publicly acknowledge that its original decision to place Firke on the list was a

**MEMORANDUM DECISION AND ORDER - 15**

mistake, merely removing him would not "completely and irrevocably irradicate[]" the stigmatizing effects of the alleged violations. *Id.*

In stark contrast to the FBI in *Fikre*, Defendant Tewalt has identified an external catalyst for his decision to reconsider and approve Pizzuto's requests—namely, the Supreme Court's decision in *Ramirez*. Moreover, unlike the government officials in *Fikre*, Defendant Tewalt has offered repeated, sworn assurances that Pizzuto will not be denied the religious accommodations at the time of his execution. In short, the reasons the Ninth Circuit rejected the government's assertion of mootness in *Fikre* are simply not applicable in this case.

### 3. Conclusion

Pizzuto brought this lawsuit to ensure that his spiritual advisor will be allowed in the execution chamber to say an audible prayer and maintain physical contact with him during his execution. Following the United States Supreme Court's decision in *Ramirez*, the defendants approved each of Pizzuto's requests in specific and unequivocal terms. Still, Pizzuto is not satisfied. He asks the Court to keep this case alive until the defendants formally enshrine the principles of *Ramirez* into the State's written execution protocols. To do so, however, would be to venture beyond the Court's constitutionally limited role of deciding cases and controversies. At this stage, Pizzuto no longer has any personal stake in this case. And because the defendants have made absolutely clear that they will provide

MEMORANDUM DECISION AND ORDER - 16

Pizzuto with his requested accommodations, the Court is left without jurisdiction to opine on whether the State ought to modify its written policies to reflect the principles set forth in *Ramirez*.

This case is moot.

## ORDER

**IT IS ORDERED that** Defendants' Motion to Dismiss Amended Complaint [DKT 23] (Dkt. 70) is **GRANTED**. This case is **DISMISSED WITHOUT PREJUDICE**.

DATED: June 4, 2024

B. Lynn Winmill
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 17